UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


BRAD E. MINKS,                    )
                                  )
            Plaintiff,            )
                                  )
      v.                          )        No. 4:06 CV 1668 RWS
                                  )                            DDN
MICHAEL J. ASTRUE,[1]             )
Commissioner of                   )
Social Security,                  )
                                  )
            Defendant.            )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying the application of plaintiff Brad E. Minks for disability insurance benefits and supplemental security income under Title II and Title XVI of the Social Security Act (the Act), 42 U.S.C. §§ 401, et seq., and 1381, et seq. The action was referred to the undersigned United States Magistrate Judge for review and a recommended disposition under 28 U.S.C. § 636(b). For the reasons set forth below, the undersigned recommends that the ALJ's decision be affirmed.


**I. BACKGROUND**

Plaintiff Brad E. Minks was born on September 25, 1973. (Tr. 308.) He is 5'6" tall with a weight around 150 pounds. (Tr. 86, 204.) He is married and has two infant children. (Tr. 308.) He completed twelve years of school and last worked at Little Tikes, a manufacturer of playground equipment. (Tr. 88, 93.)

On October 8, 1982, Minks applied for supplemental security income and was found eligible for payments. Minks received payments until June 1999, when the payments were terminated because of excess resources.

---

[1]Jo Anne B. Barnhart was the original defendant. Michael J. Astrue became the Commissioner of Social Security on February 12, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue is substituted as defendant in this suit. 42 U.S.C. § 405(g).

On April 23, 2002, Minks applied for disability insurance benefits, alleging he became disabled and unable to work on August 31, 2001, as a result of cerebral palsy. (Tr. 50, 86-87.) On June 5, 2002, the application was denied. (Tr. 97.) On February 5, 2004, Minks again applied for disability insurance benefits, alleging he became disabled on January 7, 2004, as a result of cerebral palsy, and hip and neck surgery. (Tr. 12, 53.) The application was initially denied on April 29, 2004. (Tr. 34-38.) A hearing was held on July 26, 2005. (Tr. 307.) On September 7, 2005, the ALJ sent a letter to Minks's lawyer, asking her if she would stipulate to a closed period of disability, running from August 31, 2001, until March 3, 2003. (Tr. 19.) On October 11, 2006, the ALJ denied benefits. (Tr. 18.) On September 22, 2006, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 5-7.)

## II. MEDICAL HISTORY

In two reports, Minks completed a disability report and a work history report for the Social Security Administration. He noted a history of cerebral palsy, and surgery on both hips and his neck. [2] He could not bend over or stand for prolonged periods without pain. He stopped working on January 7, 2004, because he "just couldn't do it -- overtime was mandatory and I just couldn't do it -- was also very hot and dusty." Minks had worked at Little Tikes, cleaning and carrying playground slides, from May 20, 1999, to January 7, 2004. He worked

---

[2]Cerebral palsy refers to any one of a number of neurological disorders that appear in infancy or early childhood and permanently affect body movement and muscle coordination, but do not worsen over time. Even though cerebral palsy affects muscle movement, it is caused by abnormalities in the brain that control muscle movements; it is not caused by any problems relating to the muscles or nerves. The majority of children with cerebral palsy are born with it. The most common signs of cerebral palsy are a lack of muscle coordination when performing voluntary movements (ataxia); stiff or tight muscles and exaggerated reflexes (spasticity); walking with one foot or leg dragging; walking on the toes, a crouched gait, or a "scissored" gait; and muscle tone that is either too stiff or too floppy. National Institutes of Health, http://www.ninds.nih.gov/disorders/cerebral_palsy/cerebral_palsy.htm (Last visited January 28, 2008.)

twelve hours a day, three to six days a week.  As part of the job, he would frequently lift slides weighing fifty pounds.  Typically, he would walk and stand twelve hours each day.  In 1998, Minks received training as a carpenter with Job Corps.  (Tr. 107, 117-26, 127-35.)

On April 8, 1999, Dr. Susan Cox, M.D., completed a general medical examination for the Missouri Department of Elementary and Secondary Education.  She noted Minks had an abnormal gait and a speech impediment, as a result of a right hemiparesis at birth.[3]  He also had mild right facial muscle weakness, with drooping of the right upper lip, and noted a seizure disorder since childhood.  She recommended speech therapy.  (Tr. 142-43.)

On May 6, 2001, Minks complained of being hit in the mouth with a baseball.  The impact broke his top dentures, and his lip on the left upper side was swollen.  The doctors noted a prior history of muscular dystrophy and seizures.[4]  A physical examination showed Minks's general appearance was normal and he had no major symptoms.  Minks said his pain was 5/10.  The lip was sutured and Minks was discharged in fair condition.  (Tr. 158-64.)

On July 16, 2001, Minks saw Dr. John Clohisy, M.D., complaining of moderate bilateral hip pain and groin pain.  Minks noted working full time as a paint technician in a playground equipment manufacturing company.  He was married and said he did not smoke.  A physical examination showed arthritis, some numbness, and tingling.  Minks had cerebral palsy and a previous seizure disorder, for which he was not currently medicated.  Minks also tested positive, bilaterally, for

---

[3]Hemiparesis is slight paralysis, affecting one side of the body. Stedman's Medical Dictionary, 695 (25th ed., Williams & Wilkins 1990).

[4]Muscular dystrophy is an inborn abnormality of muscle associated with dysfunction and ultimately deterioration.  Stedman's Medical Dictionary, 481.

Trendelenburg's and impingement.[5]  Dr. Clohisy diagnosed Minks with symptomatic dysplasia and suggested surgery. [6]  (Tr. 262-67.)

On August 31, 2001, Minks saw Dr. Clohisy, complaining of bilateral hip pain.  A physical examination showed Minks had a slight limp, due to the cerebral palsy.  The left hip was somewhat irritable, and Minks had bilateral Trendelenburg's and impingement.  Dr. Clohisy diagnosed Minks with bilateral hip dysplasia.  A periacetabular osteotomy was planned for October.[7]  (Tr. 259-60.)

On October 5, 2001, Dr. Huy Tran, M.D., found the lungs were clear of any infiltrates, pulmonary nodes, or pleural effusions.[8]  (Tr. 286.)

On October 12, 2001, Dr. Clohisy and Dr. Alpesh Patel, M.D., performed a left hip periacetabular osteotomy and a left adductor, and a gracilis tenotomy.[9]  A physical examination showed Minks had a regular heart rate and rhythm, a clear chest, and nontender abdomen.  Minks was

_____

[5]Trendelenburg's symptom is a waddling gait caused by partial paralysis of the gluteal muscles, as in progressive muscular dystrophy. Stedman's Medical Dictionary, 1519.  Impingement syndrome is a condition affecting the shoulder and is related to shoulder bursitis and rotator cuff tendinitis.  These conditions may occur alone or in combination. http://www.webmd.com/osteoarthritis/guide/impingement-syndrome  (Last visited January 28, 2008.)

[6]Dysplasia is abnormal tissue development.  Stedman's Medical Dictionary, 479.

[7]A periacetabular osteotomy is a surgical treatment for acetabular dysplasia that preserves and enhances the patient's own hip joint rather than replacing it with an artificial part.  The goal is to alleviate the patient's pain, restore function, and maximize the functional life of the dysplastic hip.  Hip & Pelvis Institute at St. John's Health Center, http://hipandpelvis.com/patient_education/index.html  (Last visited January 29, 2008).  An acetabulum is a cup-shaped depression on the external surface of the hip bone, in which the head of the femur sits. Stedman's Medical Dictionary, 11.

[8]Effusion is the escape of fluid from the blood vessels into the tissues or into a cavity.  Stedman's Medical Dictionary, 491.

[9]A tenotomy is the surgical division of a tendon for relief of a deformity caused by congenital or acquired shortening of a muscle. Stedman's Medical Dictionary, 1562.  Gracilis refers to a thin or slender structure.  Id., 665.  An adductor is a muscle that draws a part toward the median plane.  Id., 23.

diagnosed with left hip acetabular dysplasia. The operation was successful and Minks was discharged on October 17, in stable condition. He could resume his regular diet, but was limited to bearing thirty pounds on the left lower extremity. Upon discharge, he was on Vicodin, Iron, and Aspirin.[10] (Tr. 144-52.)

On October 14, 2001, Minks saw Dr. Henry Royal, M.D., and Dr. Cynthia Santillan, M.D., complaining of hypoxia.[11] Minks was evaluated for a pulmonary embolism, which was ruled unlikely.[12] Drs. Royal and Santillan noted Minks had a severely heterogeneous perfusion in each lung field.[13] (Tr. 284.)

On October 22, 2001, Minks complained of testicular discomfort. A physical examination showed no abnormalities and no major symptoms. Minks stated he was not in pain. (Tr. 153-57.)

On November 26, 2001, x-rays of the left hip revealed bilateral deformities of the femoral neck and head. The x-rays showed flattening of the femoral heads, bilaterally, and evidence of supra-acetabular reconstruction with screws. (Tr. 282.)

On November 30, 2001, Minks saw Dr. Clohisy for a screw exchange for his left hip. Minks tolerated the procedure well and there were no complications. (Tr. 251-52.)

On December 31, 2001, Minks saw Dr. Clohisy, and had no complaints. He was walking with a walker, but doing well. Dr. Clohisy noted the screws were in good position and the osteotomy seemed to be healing. An x-ray showed both femoral heads were wide and the acetabula were shallow. The alignment of the pelvis was unchanged since the last x-

---

[10]Vicodin is a combination narcotic and non-narcotic, and is used to relieve moderate to severe pain. http://www.webmd.com/drugs (Last visited January 29, 2008).

[11]Hypoxia is a shortage of oxygen in the blood. Stedman's Medical Dictionary, 756.

[12]A pulmonary embolism is the obstruction or blockage of the pulmonary arteries, and occurs most frequently when a blood clot from a vein becomes dislodged. Stedman's Medical Dictionary, 500-01.

[13]Perfusion is blood flow. Stedman's Medical Dictionary, 1162.

ray.  Dr. Clohisy suggested an aggressive hip strengthening program and wanted to advance Minks to full weightbearing.  (Tr. 257, 278.)

On February 25, 2002, Minks saw Dr. Clohisy.  At the time, Minks needed a cane for walking, but reported minimal pain in his left hip.  Minks stated he was very pleased with the surgery and expressed an interest in scheduling a right hip surgery.  An x-ray showed the left hip periacetabular osteotomy had healed well.  Dr. Clohisy cleared Minks for light duty work, but restricted Minks from prolonged standing or lifting.  (Tr. 255-56.)

On April 23, 2002, Minks completed a disability report, alleging he became disabled and unable to work on August 31, 2001.  In the report, Minks noted his work history.  From May 1999 to August 2001, he worked building, lifting, and painting crates.  As part of the job he would use machines, frequently lift fifty pounds or more, and sometimes lift up to seventy-five pounds.  He spent eight-hours of each day walking.  Minks completed special job training in carpentry in 1998.  (Tr. 86-95.)

On April 29, 2002, Minks saw Dr. Clohisy, and noted marked pain relief.  Minks said he still had occasional pain, but was close to 95% better.  Dr. Clohisy noted Minks had a moderate limp, but did not require any support.  He could walk for an unlimited distance, could use the stairs with a banister, and sit for one hour.[14]  An x-ray of the pelvis showed the left acetabular reconstruction was well healed.  In his plan, Dr. Clohisy found Minks could return to work with a lifting restriction of thirty pounds.  In two months time, Dr. Clohisy believed Minks could return to full duty.  (Tr. 253-54, 276.)

On May 31, 2002, Melissa Gulliams noted her observations.  Minks had a history of cerebral palsy, but despite the impairment, was still able to do the normal activities "other kids did while growing up."  He

---

[14]The questionnaire from Dr. Clohisy asked various questions concerning Minks's limitations.  For distances, the options were: A) unlimited; B) six blocks; C) two to three blocks; D) indoors only; and E) bed or chair.  For stairs, the options were: A) normal; B) banister; C) any method; and D) unable.  For sitting, the options were: A) any chair, one hour; B) high chair, half an hour; and C) unable for half an hour.  (See Tr. 301.)

also had a mild limp, but was able to work in a factory setting.  Minks had bilateral hip dysplasia, and had undergone a left hip periacetabular osteotomy in October 2001.  The post-operation notes indicated improvement with the surgery and showed Minks was experiencing only slight pain.  He had a slight limp but did not need any external support.  Minks had medical impairments, but the full functional impact of the impairments was uncertain.  (Tr. 96.)

On June 17, 2002, Dr. Ray Murphy, D.O, noted degenerative changes at C3-4.  There was mild lipping, and the joints at C3-4 and C4-5 showed hypertrophic changes.[15]  (Tr. 200.)

On September 13, 2002, Minks saw Dr. Clohisy and Dr. Sandra Klein, M.D., for a right periacetabular osteotomy.  The doctors noted that the left hip osteotomy produced very good results.  A physical examination showed Minks had a regular heart rate and rhythm, clear lungs, and nontender abdomen.  An x-ray of his hip showed right hip dysplasia.  The surgery was successful and he did well in physical therapy.  Minks was told to limit his weight bearing on his right lower side to thirty pounds.  Minks was discharged on September 17, in stable condition.  He was able to walk without the assistance of a walker or crutches.  Upon discharge, Minks was taking Aspirin, Iron, Peri-Colace, Valium, and Vicodin.[16]  (Tr. 165-72.)

---

[15]The human spinal column consists of thirty-three vertebrae. There are seven cervical vertebrae (denoted C1-C7), twelve thoracic vertebrae (denoted T1-T12), five lumbar vertebrae (denoted L1-L5), five sacral vertebrae (denoted S1-S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx).  The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the lower back.  The sacrum is immediately below the lumbar vertebrae.  Stedman's Medical Dictionary, 226, 831, 1376, 1549, 1710, Plate 2.  Hypertrophy is the general increase in bulk of a part or organ, but not due to tumor formation.  Id., 746.  Lipping is an outgrowth of bone at a joint in a liplike form.  Merriam-Webster Medical Dictionary, http://www.merriam-webster.com/dictionary/lipping (Last visited January, 30, 2008.)

[16]Peri-Colace is used to treat constipation.  Valium is used to treat anxiety, seizures, and can also be used to relieve muscle spasms. http://www.webmd.com/drugs (Last visited January 30, 2008).

On November 1, 2002, Minks saw Dr. Clohisy for an adjustment of one of the right hip screws.  Minks tolerated the procedure and there were no complications.  (Tr. 249-50.)

On December 2, 2002, Minks saw Dr. Clohisy for a follow-up of his right periacetabular osteotomy.  Minks was doing well and had no complaints or problems.  A physical examination showed the wounds had healed well.  An x-ray of the pelvis showed no changes.  Minks noted 50% weightbearing.  Dr. Clohisy said he would see Minks in three months. (Tr. 248, 274-75.)

On March 3, 2003, Dr. Clohisy found Minks was doing very well ("excellent") following his hip surgeries, with no hip pain on either side.  Minks had a waddling gait because of the cerebral palsy, but could still walk up to a mile.  He did not need a cane, but putting on his socks and shoes was difficult.  An x-ray of the pelvis and hip area showed healing in the osteotomy sites.  Dr. Clohisy told Minks he could return to work full duty.  (Tr. 247, 273.)

On March 13, 2003, Dr. R.W. Templin, D.O, performed an MRI of Minks's cervical spine.  The MRI revealed a large disk and spur combination at C3-4, extending into the left side of the anterior epidural space near the nerve root exit canal.  Dr. Templin also noted some mild spurring and disk bulging at C4-5, C5-6, and C6-7, but without any significant stenosis or herniation.[17]  (Tr. 199.)

On April 9, 2003, Dr. John Metzler, M.D., wrote to Minks, informing him that an MRI showed no evidence of disk herniation.  (Tr. 214.)

On April 23, 2003, Pat Jones completed a disability report and, after personally observing Minks, recommended an onset date of September 1, 2001.  (Tr. 82-85.)

---

[17]A spur, or calcar, is a small projection from a bone.  Stedman's Medical Dictionary, 227.  Stenosis is the narrowing or constriction of any canal.  Id., 1473.  A herniated disk is a protruded or ruptured disk.  The protrusion will compress the nerve root or the cauda equina. Id., 260, 455.  The cauda equina is a collection of nerves below the end of the spinal cord, which travel down the thecal sac and go to the muscles and skin. http://www.neurosurgerytoday.org/what /patient_e/tethered.asp  (Last visited January 30, 2008.)

On May 1, 2003, Minks saw Dr. J. Alexander Marchosky, M.D., complaining of cervical pain. At the time, Minks was working and denied smoking or drinking. A physical examination showed the right and left hip incisions had healed well. Minks had good stability, clear skin, and no masses. His abdomen was nontender, his heart rate and rhythm were normal, and his chest was clear. His gait was somewhat abnormal due to the cerebral palsy. The muscular structure of the upper and lower extremities showed no loss of functional strength, and no loss of pin or touch sensation. There was no muscle spasm or tenderness in the neck, though there was a slight foreshortening of the neck in relation to the shoulder tip. Minks complained of some shoulder pain on rotation. An MRI showed severe degenerative disk disease and spondylosis at C3-4, with disk protrusion and herniation with spinal cord encroachment.[18] Dr. Marchosky noted mild degenerative disk disease at C4-5, C5-6, and C6-7. After discussing the possibilities, Minks agreed to proceed with surgery. (Tr. 234-38.)

On May 28, 2003, Minks underwent spinal surgery. Minks had a history of severe cervical pain, radiating to the shoulders and upper extremities. An MRI revealed a herniated disk and sever spondylosis at C3-4, with spinal cord encroachment and foraminal stenosis.[19] Dr. Marchosky performed an anterior partial vertebrectomy, diskectomy, and spondylectomy at C3-4, followed by structural allograft fusion with interior spinal plate instrumentation at C3-4.[20] Dr. Marchosky noted the surgery was successful, "with relief of the severe cervical pain, shoulder and upper extremity pain, and [that Minks] had slow return of

[18]Spondylosis is the stiffening or fixation of the joints within the vertebra. Stedman's Medical Dictionary, 1456.

[19]A foramen is a perforation through a bone or a membranous structure. Stedman's Medical Dictionary, 605.

[20]A vertebrectomy is the excision of a vertebra. Stedman's Medical Dictionary, 1710. A diskectomy is the surgical removal of an intervertbral disk. Miriam-Webster's Online Dictionary, http://medical.merriam-webster.com/medical (Last visited January 30, 2008). A spondylectomy is the complete surgical removal of all parts of one or more vertebrae above the sacrum. Journal of Clinical Oncology, http://jco.ascopubs.org/cgi/content/abstract/7/10/1485 (Last visited January 30, 2008).

motor and sensory function to his premorbid level." The day after the surgery, Minks was walking without difficulty and had excellent bladder control. He was discharged on May 29, and given a prescription for Motrin, Soma, and Vicodin.[21] (Tr. 109, 174-80.)

On July 8, 2003, Minks saw Dr. Marchosky, and Sherry Elze, complaining of dull neck pain, 1/10, and mild headaches, 1/10. He denied any upper extremity pain or numbness. Dr. Marchosky reviewed x-rays of Minks's neck and noted the bone plug was well seated between the vertebrae. The neck incision had healed well. A physical examination showed normal motor strength in the upper extremities and Minks's hand grips were equal and strong. Minks was able to walk without difficulty and reported walking three miles a day. His reflexes were normal and there was no numbness or tingling in the upper extremities. Dr. Marchosky stated that Minks could return to work on July 14, 2003. (Tr. 228-30.)

On July 8, 2003, Dr. Paula George examined x-rays of Minks's spine. She noted the fusion of the disk space at C3-4 with anatomic alignment, and added that there was no motion or instability with flexion and extension. (Tr. 187.)

On July 19, 2003, Minks saw Dr. David Mullen, D.O, and Dr. Kenneth Smith, M.D., complaining of ankle and foot pain. The pain was mild, 2/10, and walking aggravated the pain. A physical examination showed Minks was well-nourished, and his musculoskeletal, skin, and neurovascular systems were normal. Drs. Mullen and Smith diagnosed Minks with a foot contusion, and discharged him in stable condition. There was no evidence of any fracture or dislocation. (Tr. 189-92.) On July 31, 2003, a bone scan demonstrated that Minks had probably fractured a bone in his left foot. (Tr. 198.)

On October 24, 2003, Minks saw Dr. Jesse Hoff, concerned about his family's history of heart disease. A physical examination revealed a

---

[21]Soma is used to treat pain and discomfort from muscle injuries, such as sprains. http://www.webmd.com/drugs. (Last visited January 30, 2008).

supple neck, with no thyromegaly or carotid bruits.[22]  Minks had a regular heart rate and rhythm, and his lungs were clear.  He had no clubbing, cyanosis, or edema.[23]  Minks had some degree of muscular spasticity due to his cerebral palsy.  Dr. Hoff noted further examination of his cardiac risks was required.  (Tr. 204.)

On December 20, 2003, Minks said he was lifting an eighty-pound bag at home, when he heard a pop in his back.  (Tr. 202.)  On December 30, 2003, Minks saw Dr. Hoff, complaining of abdominal tenderness for the previous five days, no bowel movements in the previous four days, and a little bit of back pain from heavy lifting.  A physical examination showed the abdomen was nontender and there were no masses, though the mucous membranes were slightly inflamed.  Dr. Hoff also found no evidence of hernias.[24]  (Tr. 202-04.)

On February 3, 2004, Minks saw Dr. Hoff, complaining of upper abdominal discomfort and persistent epigastric distress.  A physical examination showed no abdominal masses or abnormal bowel sounds.  Dr. Hoff diagnosed Minks with slight mid-epigrastric tenderness and prescribed Protonix.[25]  (Tr. 203.)

On February 5, 2004, Cayla Eaves completed a disability report after personally observing Minks.  She noted Minks had difficultly speaking, standing, and walking.  Minks had a speech impediment, which made him hard to understand, and his gait was not normal.  (Tr. 97-101.)

---

[22]Thyromegaly is enlargement of the thyroid gland.  Stedman's Medical Dictionary, 1600.  A carotid bruit is a systolic murmur heard at the root of the neck, but not at the aortic area.  Id., 215.

[23]Clubbing is the broadening of the fingers or toes.  Stedman's Medical Dictionary, 320.  Cyanosis occurs when the skin becomes purple and blue due to deficient oxygenation of the blood.  Id., 383.  Edema is an accumulation of watery fluid in cells, tissues, or cavities.  Id., 489.

[24]A hernia is the protrusion of a part or structure through the tissues normally containing it.  Stedman's Medical Dictionary, 707.

[25]Protonix is used to treat acid-related stomach and throat problems.  http://www.webmd.com/drugs. (Last visited January 30, 2008).

On February 6, 2004, Minks saw Dr. Hoff, complaining of epigastric pain. Dr. Hoff diagnosed Minks with some esophageal reflux, but found no ulcer, stricture, hernia, or mass. (Tr. 210.)

In a report dated March 9, 2004, Minks described his impairments and their affect on his ability to work.[26] The cerebral palsy produced pain in both hips and made him unable to stand for prolonged periods. His knees also gave him problems. Climbing stairs, lifting, and prolonged standing made the problems worse. He did not need any crutches or other assistance in walking. Minks said he was able to take care of his two infant children, do laundry, make the bed, iron, take out the trash, rake leaves, bank, and go to the post office. Vacuuming or sweeping put pressure on his hips, and doing laundry was difficult because it required going up and down the steps. Minks also had difficulty putting on his socks. Minks can drive and reported no problems following instructions. (Tr. 102-06.)

On April 12, 2004, Dr. Clohisy saw Minks for a follow-up of his periacetabular osteotomies. Minks said he had slight occasional pain on each side, but was happy with the result of his surgeries. Dr. Clohisy noted Minks was "markedly improved compared to preoperatively." Dr. Clohisy noted a moderate limp and shuffling gait due to the cerebral palsy. At the same time, Minks required no support, and could walk an unlimited distance. He could walk up stairs with a banister, take transportation, and sit for one hour. Putting on socks and shoes remained difficult. Dr. Clohisy found Minks's neurovascular system intact and x-rays showed the osteotomies had healed without problems. (Tr. 212-13, 271.)

On April 28, 2004, Dr. Donald Edwards, M.D., completed a physical residual functional capacity assessment. Dr. Edwards noted the primary diagnosis was cerebral palsy, and the secondary diagnosis was bilateral hip dysplasia and cervical degenerative disk disease. Dr. Edwards believed Minks could occasionally lift twenty pounds, frequently lift ten pounds, and perform an unlimited amount of pushing and pulling. He believed Minks could stand, walk, and sit, with normal breaks, for about

_____

[26]While the report itself bears no date, the Social Security Administration dated the report March 9, 2004. (Tr. 3.)

-12-

six hours in a normal eight-hour workday.  In addition, he noted Minks had no manipulative, visual, or communicative limitations.  (Tr. 216-23.)

In reaching these conclusions, Dr. Edwards noted that Minks had not received "treatment in years."  Dr. Edwards found Minks had normal speech and gait, normal reflexes, and normal range of motion, except for his right wrist.  Minks said he could drive without problems, take out the trash, prepare simple meals, and watch television.  Minks did not indicate he was currently taking any medications.  According to Dr. Edwards, Minks's "alleged limits are not supported by exam findings and are considered partially credible."  Specifically, Dr. Edwards noted Minks's hip surgery had been two years earlier, and all reports indicated he was doing well and able to walk.  Minks had some limitations from the cerebral palsy, but had worked with these limitations in the past.  ( Id.)

On June 10, 2004, Minks completed a disability report.  He noted there were no changes in his condition since last completing a disability report.  He was taking Advil for the pain in his hip, knee, and neck.  He had not worked since completing his last disability report.  He had problems putting on his socks and shoes, and said it took him longer to do simple tasks.  He could not bend over or twist around.  (Tr. 110-16.)

On December 7, 2004, Dr. Daniel Hatfield, M.D., and Emily Smith, M.D., reviewed x-rays of Minks's hips.  The x-rays showed the periacetabular osteotomies were "solidly healed."  There were no acute fractures and no other osseous abnormalities.  Drs. Smith and Hatfield noted femoral head flattening, consistent with a history of dysplasia. (Tr. 269.)

That same day, Minks also saw Dr. Clohisy, complaining of mild right hip pain and moderate left hip pain.  Minks believed the surgeries were helpful, but noted a sensation of stiffness.  Minks limped, but could walk up to six blocks without a cane.  Dr. Clohisy diagnosed Minks with bilateral periacetabular osteotomies, and recommended symptomatic treatment.  Minks was to return in a year, or sooner if he had problems. (Tr. 290-91, 301.)

On May 27, 2005, Minks said his left hip was getting worse, and he wanted to try a cortisone injection. (Tr. 293.) On June 23, 2005, Minks saw Dr. Metzler for a cortisone injection of his left hip. At the time, Minks completed a physiatric spine questionnaire. He indicated his back pain was 7/10. The pain prevented him from standing more than an hour and limited his sleep to less than six hours. The pain was bad during traveling, but Minks stated he could manage on journeys over two hours. Because of the back pain, Minks had to frequently change positions to get comfortable, and use a handrail to get up stairs. Getting dressed took longer, he could not stand for long periods, and he tried not to bend down or kneel. Minks noted it was difficult to get out of a chair and the pain in his back or leg was painful all the time. (Tr. 294-97, 304.)

**Testimony at the Hearing**

At the hearing on July 26, 2005, Minks noted his work history. He last worked at Little Tikes on January 7, 2004, cleaning the parts for playground equipment. Minks worked there, full-time, for four and a half years. While at Little Tikes, Minks would have to lift anywhere from forty to fifty-pound equipment. Minks did not work before his job at Little Tikes. He had received training in carpentry, but never worked as a carpenter. Minks stopped working because the job was becoming too heavy on his body. He also said the job was affecting him mentally, and he had to take days off. He was ultimately fired for missing too much work. (Tr. 307-11.)

Minks had not been hospitalized in the past year, but said his head and neck trouble prevented him from working. Minks said the cortisone injections helped the pain in his hip. At the time of the hearing, he was taking Ibuprofen and Tylenol. He was not taking anything stronger or anything requiring a prescription. In addition, Minks noted that his doctors had not limited his activities. "He just said do whatever I can, and just take it easy. If I can do it do it." (Tr. 311-12.)

Minks said he could not work because of the pain in his hips and neck, and his slipped disk. After walking an hour, he noted particular pain in his back and legs. He could sit comfortably for thirty or

forty-five minutes.  He could lift up to fifty or sixty pounds, but not all day.  Minks was able to prepare meals, clean dishes, and mow the yard.  He was able to play with the kids, but had to crawl to the couch to lift himself back up.  (Tr. 312-14.)

While in high school, Minks received special education classes because he had trouble with comprehension.  He was not in any special gym class.  While he was working at Little Tikes, Minks would receive some help from the other workers in performing his job.  Minks's neck pain was the result of a slipped disk from an accident he had when he was fifteen years old.  His hip pain was the result of wear and tear in the cartilage and a part of the hip being flat instead of rounded.  Minks noted one leg was shorter than the other and he would limp because of his cerebral palsy.  Since his surgery, he had fallen once or twice.  He also noted stiffness and trembling in his fingers, stiffness in his legs and back, and trouble sleeping.  (Tr. 314-20.)

### III.  DECISION OF THE ALJ

The ALJ found Minks suffered from cerebral palsy, chronic neck pain status post C3-4 fusion, and a periacetabular osteotomy of both hips due to symptomatic hip dysplasia.  The ALJ found that these impairments were severe.  (Tr. 14.)

The ALJ noted Minks's subjective complaints, but ultimately determined the allegations concerning his limitations were not completely consistent with the objective medical evidence.  According to Minks, he was unable to work because of the pain from the slipped disk, and the pain in his hip and neck.  Minks stated that prolonged walking caused pain and he could only comfortably sit for thirty to forty-five minutes.  He could lift around fifty to sixty pounds, but not all day on a regular job.  He could lift his children, who weighed around thirty pounds.  Minks also stated he had trouble with his hands.  His left hand would jerk at night, and his right pinky finger sits under his ring finger, which makes typing difficult.  (Tr. 14-18.)

The ALJ found these impairments to be severe, but still found Minks retained the residual functional capacity (RFC) to perform a full range of light work.  Under Social Security Ruling 83-10, light work requires

the use of arms and hands to grasp, hold, and turn objects, and does not generally require the use of fingers. Because Minks could wash dishes, clean his garden, and mow the lawn, the ALJ found Minks's hand impairments did not preclude light work. The ALJ also found Minks could lift twenty pounds occasionally, ten pounds frequently, could stand and walk for at least six hours in an eight-hour workday, and could sit for at least two hours in an eight-hour workday. Minks could only occasionally bend and stoop. (Tr. <u>Id.</u>)

The ALJ noted that medical evidence and Minks's own activities and abilities supported the RFC finding. The ALJ also noted that Minks had received unemployment benefits after his alleged onset date, meaning Minks had certified that he was ready, able, and willing to work. In addition, Minks had worked for a considerable period after his alleged onset date. The ALJ found Minks could not perform his past work, but could perform the full range of light work. Accordingly, Minks was not disabled within the meaning of the Social Security Act. (Tr. <u>Id.</u>)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. <u>Pelkey v. Barnhart</u>, 433 F.3d 575, 577 (8th Cir. 2006). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion." <u>Id.</u> In determining whether the evidence is substantial, the court considers evidence that detracts from, as well as supports, the Commissioner's decision. <u>See</u> <u>Prosch v. Apfel</u>, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. <u>See</u> <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least 12

months.  See 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A).  A five-step regulatory framework governs the evaluation of disability in general.  See 20 C.F.R. §§ 404.1520, 416.920; see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003).  If the Commissioner finds that a claimant is disabled or not disabled at any step, a decision is made and the next step is not reached. 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4).

Here, the Commissioner determined that Minks maintained the residual functional capacity (RFC) to perform the full range of light work.

## V.  DISCUSSION

Minks argues the ALJ's decision is not supported by substantial evidence.  Specifically, Minks argues the ALJ erred by failing to consult a vocational expert and by looking only to the Medical-Vocational Guidelines.  Next, Minks argues the ALJ's decision contains an inaccuracy.  Finally, Minks argues the ALJ erred by placing too much emphasis on his receipt of unemployment benefits during the period of disability.  (Doc. 13.)

**Vocational Expert Testimony**

When the ALJ determines that a claimant cannot perform past relevant work, the burden shifts to the Commissioner to prove there is work in the national economy that the claimant can perform.  Ellis v. Barnhart, 392 F.3d 988, 993 (8th Cir. 2005); 20 C.F.R. § 404.1560(c). If the ALJ finds the claimant has only exertional impairments, the Commissioner may meet this burden by referring to the Medical-Vocational Guidelines.  Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992). If the ALJ finds the claimant suffers from a nonexertional impairment, the Commissioner may meet this burden by consulting the Guidelines only in certain circumstances.  See Thompson v. Astrue, 226 F. App'x 617, 621 (8th Cir. 2007); Sanders v. Sullivan, 983 F.2d 822, 823 (8th Cir. 1992). "An ALJ may use the Guidelines even though there is a nonexertional impairment if the ALJ finds . . . that the nonexertional impairment does

not diminish the claimant's residual functional capacity to perform the full range of activities listed in the Guidelines." Thompson, 226 F. App'x at 621. The medical record must support the ALJ's finding. Id. On the other hand, if the ALJ finds the claimant has nonexertional impairments, and these impairments diminish the claimant's capacity to perform the full range of jobs listed in the Medical-Vocational Guidelines, the Commissioner must solicit testimony from a vocational expert to show the claimant has the capacity to perform work in the national economy. Robinson, 956 F.2d at 841. A nonexertional impairment is any limitation, besides strength, which reduces an individual's ability to work. Sanders, 983 F.2d at 823. Pain is one such limitation. See Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991).

In this case, the ALJ found Minks's subjective complaints of pain were not consistent with the medical evidence. Instead, the ALJ found Minks's limitations were not disabling, and Minks had the RFC to perform the full range of light work under the Guidelines. Under Thompson, the ALJ was not required to solicit vocational expert testimony, if the medical record supports this finding. See Thomspon, 226 F. App'x at 621.

Substantial medical evidence supports the ALJ's finding that Minks had the RFC to perform the full range of light work. Minks has suffered from cerebral palsy since childhood. Despite the limitation, Minks noted he was able to do the normal activities other children did while growing up. As an adult, Minks walked with an abnormal gait, but did not require crutches or other assistance. In an undated report, he stated he was able to take care of his children, do laundry, make the bed, iron, take out the trash, rake leaves, and drive. In July 2001, Minks told Dr. Clohisy, his treating physician, that he was not taking any medication, despite complaints of hip pain and groin pain. In October 2001, Dr. Clohisy performed a left hip periacetabular osteotomy. The surgery was successful and Minks was discharged in stable condition. At the time, he was told he could bear thirty pounds on the lower left extremity. In December 2001, Dr. Clohisy noted the osteotomy was healing, and wanted to advance Minks to full weightbearing.

In February 2002, Dr. Clohisy cleared Minks for light duty work. In April 2002, Dr. Clohisy cleared Minks to return to work with a lifting restriction of thirty pounds. At the time, Minks noted he had occasional pain, but was close to 95% better. In September 2002, Dr. Clohisy performed a right hip periacetabular osteotomy. In March 2003, Dr. Clohisy noted Minks was doing well and cleared him to return to work full duty. In May 2003, Dr. Marchosky found Minks had no loss of muscular strength in the upper or lower extremities. In July 2003, Dr. Marchosky found Minks had normal motor strength in the upper extremities and found his hand grips were equal and strong. Minks reported walking three miles a day, without difficulty. Dr. Marchosky said Minks could return to work.

In April 2004, Dr. Clohisy found Minks to be markedly improved, compared to pre-surgery. At the time, Minks could walk an unlimited distance, without support, sit for the maximum period, and walk up stairs with a banister. That same month, Dr. Edwards believed Minks could occasionally lift twenty pounds and frequently lift ten pounds. He believed Minks could stand, walk, and sit, with normal breaks, for about six hours in a normal eight-hour workday. In July 2006, at the hearing, Minks testified that he could lift up to fifty or sixty pounds, though not all day. He said he was able to prepare meals, clean dishes, and mow the yard. He was not taking any strong prescription medication. See Combs v. Astrue, 243 F. App'x 200, 205 (8th Cir. 2007) (Non-prescription pain medications and over-the-counter medications are inconsistent with complaints of disabling pain.). In addition, his doctors had not placed any limitations on his activities. See Hensley v. Barnhart, 352 F.3d 353, 357 (8th Cir. 2003) ("[N]o functional restrictions were placed on [claimant's] activities, a fact that we have previously noted is inconsistent with a claim of disability."). Looking to the record, substantial medical evidence supports the ALJ's finding that Minks had the RFC to perform the full range of light work. The ALJ was not required to call a vocational expert.

**Inaccuracy in the Decision**

In the decision, the ALJ noted, "[b]y his own admission, work activity ceased in January 2004 due to pain and weakness relevant to his neck, back, and hip pain and not due to cerebral palsy." (Tr. 16.) Minks argues this statement is inaccurate, since his neck, back, and hip pain represent the affects of his cerebral palsy.

This inaccuracy, without more, does not serve as a basis for remand. The ALJ noted that Minks suffered from cerebral palsy, chronic neck pain, and dysplasia of the hips. The ALJ found these impairments to be severe. Since the ALJ properly considered all of Minks's alleged impairments, including his cerebral palsy, the misstatement quoted above does not serve as a basis for remand. See Johnson v. Apfel, 240 F.3d 1145, 1149 (8th Cir. 2001) ("Any arguable deficiency . . . in the ALJ's opinion-writing technique does not require [the reviewing] Court to set aside a finding that is supported by substantial evidence.").

**Unemployment Benefits**

In the decision, the ALJ noted that Minks's receipt of unemployment benefits after the alleged onset date was a factor cutting against his alleged disability. Minks argues the ALJ placed too much emphasis on the receipt of unemployment benefits. He also argues that the receipt of unemployment benefits does not necessarily preclude a finding of disability.

The ALJ properly considered Minks's receipt of unemployment benefits. "Applying for unemployment benefits may be some evidence, though not conclusive, to negate a claim of disability." Johnson v. Chater, 108 F.3d 178, 180-81 (8th Cir. 1997); see also Salts v. Sullivan, 958 F.2d 840, 846 n.8 (8th Cir. 1992) ("[I]t is facially inconsistent for [a claimant] to accept unemployment compensation while applying for social security benefits."). Minks's receipt of unemployment compensation was just one of several factors the ALJ considered in denying benefits. In addition, the ALJ limited her discussion of the topic to one paragraph in a seven-page opinion. Under Johnson, the ALJ did not place too much emphasis on Minks's receipt of unemployment compensation. Johnson, 108 F.3d at 180-81.

## VI.  RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed under Sentence 4 of 42 U.S.C. § 405(g).

The parties are advised that they have ten days to file written objections to this Report and Recommendation.  The failure to file timely written objections may waive the right to appeal issues of fact.


___/S/   David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**


Signed on February 7, 2008.